**2015 BNH 006**     Note:   This is an unreported opinion.  Refer to LBR 1050-1 regarding citation.
_____

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEW HAMPSHIRE

In re:                                                                                                  Bk. No. 14-10606-BAH
                                                                                                        Chapter 7
Dendra L. Abdinoor,
        Debtor

Dendra L. Abdinoor,
        Plaintiff

v.                                                                                                      Adv. No. 14-1048-BAH

Navient Solutions, Inc.,
Granite State Management & Resources,
Affiliated Computer Services,
New Hampshire Higher Education Loan Corporation, and
U.S. Department of Education,
        Defendants

*Arthur O. Gormley, III, Esq.*                  *Paul M. Colella, Esq.*
*Gormley & Gormley, PC*                         *Law Offices of Paul M. Colella*
*Nashua, New Hampshire*                         *Winchester, Massachusetts*
*Attorney for Plaintiff*                        *Attorney for Defendant Affiliated Computer Systems*


*Marc W. McDonald, Esq.*                        *Michael T. McCormack, Esq.*
*Kazan, Shaughnessy & McDonald, PLLC*           *U.S. Attorney's Office*
*Manchester, New Hampshire*                     *Concord, New Hampshire*
*Attorney for Defendant Navient Solutions, Inc.*   *Attorney for Defendant U.S. Department of Education*


*Cori Phillips Palmer, Esq.*
*Daniel M. Deschenes, Esq.*
*Hinckley, Allen & Snyder, LLP*
*Concord, New Hampshire*
*Attorneys for Defendants Granite State Management & Resources*
*and New Hampshire Higher Education Loan Corporation*

## **MEMORANDUM OPINION**

**I. INTRODUCTION**

Dendra L. Abdinoor (the "Debtor" or "Plaintiff") filed a complaint under 11 U.S.C. § 523(a)(8) seeking to discharge her student loan debt. The Debtor borrowed money from numerous lenders in order to fund her college education. The promissory notes are currently held and/or serviced by the Defendants, Navient Solutions, Inc. ("Navient"); Granite State Management & Resources and New Hampshire Higher Education Loan Corporation (collectively, "NHHELCO"); Affiliated Computer Services ("ACS"); and the U.S. Department of Education ("USDE"). The Debtor contends that continuing to pay her student loan debt would impose an undue hardship on her.

The Court conducted a trial of this matter on June 9, 2015, and took the matter under advisement. This Court has jurisdiction of the subject matter and the parties pursuant to 28 U.S.C. §§ 1334 and 157(a) and Local Rule 77.4(a) of the United States District Court for the District of New Hampshire. This is a core proceeding in accordance with 28 U.S.C. § 157(b).

**II. FACTS**

The Debtor attended Suffolk University from 2006 to 2008 and then transferred to the University of New Haven where she obtained a Bachelor's Degree in Criminal Justice in May 2010. In order to fund her college education, the Debtor obtained grants and scholarships; worked part-time; participated in work study; and obtained several student loans, which are the subject of this adversary proceeding. The Debtor borrowed money as follows:

| Date Note Executed | Lender[1] | Loan Amount |
|---|---|---|
| June 23, 2006 | USDE | $7,125.00 |
| July 31, 2006 | ACS | $32,535.38[2] |
| October 27, 2007 | NHHELCO | $30,000.00 |
| August 7, 2008 | Navient | $25,056.00 |
| October 6, 2008 | USDE | $4,000.00 |
| October 6, 2008 | USDE | $5,500.00 |
| October 6, 2008 | USDE | $4,500.00 |

The loans became due and payable in November 2010, six months after the Debtor's college graduation. At that time, the total amount due on all notes was $108,716.38; the Debtor's payments on all notes totaled $998.00 per month.

Since graduating, the Debtor has held a variety of jobs. From July 2010 through July 2012, the Debtor worked part-time 20-25 hours per week as a retail sales associate earning $12.00 per hour. From January 2011 through June 2012, she also worked part-time as a private investigator for a company that had a contract with public defenders in New Hampshire and Massachusetts. She earned $12.00 per hour as an investigator. In July 2012, the Debtor obtained a part-time position as a court assistant with a New Hampshire state court. In April 2013, she started working full-time for the court and, in September 2013, received a promotion. The Debtor was earning $15.50 per hour when she left her court job in early 2015. On March 30, 2015, the Debtor began working at a Nashua law firm as a legal assistant to a criminal defense attorney. She currently earns $16.75 per hour.

According to the Debtor's tax returns, since her college graduation, she has earned the following amounts and received the following tax refunds:

---

[1] The entities listed as "Lender" now currently hold and/or service the Debtor's student loans. Some of the Debtor's loans were originally held by other entities.

[2] The Debtor borrowed $27,012.99, which was disbursed in a payment of $13,506.50 on September 29, 2006, and a second payment of $13,506.49 on January 5, 2007. However, interest on the ACS note in the amount of $5,522.39 was capitalized on November 13, 2010, pursuant to the terms of the note, which increased the principal balance to $32,535.38.

3

| Year | Earnings | Tax Refund |
|------|----------|------------|
| 2010 | $6,229.00 | $379.00 |
| 2011 | $16,482.00 | $1,145.00 |
| 2012 | $15,922.00 | $619.00 |
| 2013 | $22,474.00 | $960.00 |
| 2014 | $28,853.00 | $964.00 |

At the time of trial, the Debtor was earning $2,903.33 per month (or $34,840.00 per year) working at the Nashua law firm.  She testified that she may be eligible for bonuses as the law firm has paid bonuses to its employees in the past.  Since the Debtor obtained her degree in 2010, her earnings have increased nearly every year, with her income increasing over the last three years by 41% in 2013, by 28% in 2014, and by 21% in 2015.

In her current position, the Debtor works from 8:00 a.m. to 4:30 p.m. Monday through Friday.  She does not work nights or weekends.  She testified that she is actively looking for another job that might pay more money and recently interviewed for a position with another criminal defense attorney.  She indicated that she expects to continue working as a legal assistant as she is qualified for such a position and it uses her college degree.  She further testified that her current salary is on the low end of the scale for legal assistants, and that experienced legal assistants in a large law firm could presently earn as much as $65,000.00 to $70,000.00 per year.

After graduating from college, the Debtor returned home to New Hampshire where she first lived with her father in the family home in Salem, and then with her father at his girlfriend's home in Windham until August 2012.  The Debtor did not pay rent to her father or to her father's girlfriend.  In August 2012, the Debtor moved to her then-boyfriend's parents' home in Nashua where she paid $100.00 per month for rent.  In December 2013, her relationship with her boyfriend ended and she moved to a friend's home in Derry.  The Debtor paid her friend $250.00 every few months for rent.  When her friend advised her that he was selling his home and she

4

should look for alternative housing, the Debtor moved into her current boyfriend's home where she presently resides.  The Debtor testified that she is unsure how long this living arrangement will last, that her relationship with her boyfriend is "day-to-day," and that her boyfriend has indicated to her that he is not interested in marriage.  At the time of trial, she was not paying any rent or utilities at her boyfriend's home.  She testified that she has been unable to pay much money for rent since her college graduation due to her limited income, which has resulted in her so-called "room surfing" since graduation.  She further testified that she has looked into public housing but that the waiting period is measured in years.

In addition to her housing issues, the Debtor has also experienced transportation issues since her college graduation.  At the time of her graduation, she owned a 2005 Hyundai Sonata, which her mother purchased for her in December 2009.  In August 2012, the transmission in that car broke down, and she sold the car to a junkyard.  For several months thereafter, the Debtor's only mode of transportation was a bicycle that she had purchased earlier that summer.  The Debtor rode that bicycle to work until the beginning of November 2012.  At that time, she used money she had solicited from friends and family to purchase a salvaged 2000 Dodge vehicle.  By the summer of 2014, that car had a myriad of problems including issues with its cooling system and body problems.  After receiving a flyer in the mail for a "second chance car loan," the Debtor proceeded to purchase a 2014 Kia Rio for approximately $17,000.00.  The Debtor was able to pay $2,500.00 toward the purchase price with funds from her tax refund and with money she received as Christmas and birthday gifts; she financed the balance of approximately $14,500.00 at 10.65% interest, which requires a $277.63 monthly payment.

The Debtor filed for bankruptcy on March 27, 2014.  She listed no secured debt or priority debt on her bankruptcy schedules.  On Schedule F, she listed five unsecured obligations,

including her student loan debt and two credit cards.  The Debtor's credit card debt totaled $1,078.60.  The student loan debt totaled $105,938.17.

Prior to bankruptcy, the Debtor made payments toward her student loans as follows:

| Lender | Total Payments |
|--------|---------------:|
| USDE | $824.19 |
| ACS | $4,675.00 |
| NHHELCO | $4,505.40 |
| Navient | $5,261.49 |
| **Total** | **$15,266.08** |

Since November 2010, the Debtor has sought various forbearances and deferments from the Defendants.  She testified that she made payments in the months that she did not have forbearances or deferments.  She also applied for an income based repayment plan with the USDE which resulted in a complete elimination of her USDE payments for several years.  In addition, she received assistance from Navient's predecessor-in-interest in the form of a reduction in her interest rate.  ACS also agreed to lower her monthly payments.  The Debtor contends that she paid an average of $385.65 per month (or more than $4,600.00 per year) on her education loans in the three-and-a-half years prior to her bankruptcy filing.

At the time of trial, the Debtor was a twenty-seven year old unmarried woman with no dependents, and with no responsibility for the care of any family members.  The Debtor testified that she is in good physical and mental health.  She does not suffer from any illness or disability that would prevent her from working.  She testified that she intends to work for thirty-eight more years and retire when she is sixty-five years old.

The Debtor earns $2,903.33 per month, with her net pay totaling $2,312.87.  Despite receiving federal income tax refunds each year, the Debtor has never lowered her income tax withholding, which would eliminate her annual tax refund but would increase her monthly net

income.  Over the past four years, her refunds have averaged $922.00 per year, or $76.83 per month.

At the time of trial, the Debtor's actual monthly expenses included:

| Item | Amount |
|---|---|
| Cell phone | $70.57 |
| Food and housekeeping supplies | $300.00 |
| Clothing, laundry, and dry cleaning | $50.00 |
| Medical and dental expenses[3] | $80.00 |
| Transportation | $125.00 |
| Car insurance | $82.72 |
| Car payment | $277.63 |
| Storage unit | $122.50 |
| **Total** | $1,108.42 |

Despite reported net income of $2,312.87 and actual expenses of only $1,108.42, the Debtor has not been making payments on her student loans since filing bankruptcy in March 2014.  At trial she was unable to satisfactorily account for the remaining $1,204.45 in funds she should have had each month since starting her new job.  The Debtor indicated that she has been trying to save this money but, at the time of trial, she had only $4,000.00 in the bank.[4]

At trial, the Debtor agreed that her $122.50 monthly storage expense is not a reasonable expense.  Thus, excluding the storage expense, the Debtor's actual monthly expenses should total $985.92, resulting in disposable income of $1,326.95 per month.  If the Debtor were to add to that amount the monthly amount of her average tax refund ($76.83), which would be available to her if she lowered her income tax withholding, her disposable income would increase to $1,403.78 per month.

---

[3]  The Debtor testified that this is not a consistent expense.

[4]  The Debtor testified that she likes to keep a balance of at least $1,000.00 in her savings account and $1,500.00 in her checking account at all times.

7

As of the date of trial, the Debtor's monthly payments on her student loans were:

| Lender | Required Payment |
|---|---|
| USDE[5] | $215.00 based on income based repayment program<br>$239.88 based on standard repayment plan<br>$145.00 based on graduated repayment plan, with payments increasing to $445.00 by final two years |
| ACS | $229.32 |
| NHHELCO | $221.61 based on graduated repayment plan<br>$324.47 based on standard repayment plan |
| Navient | $194.98[6] |

Based on the Defendants' standard repayment plans, the Debtor is required to pay $988.65 per month toward her student loans. If the Debtor were to pursue the Defendants' graduated repayment plans and Navient's offer to restructure its note, the Debtor's payments on her student loans could be as low as $726.33 per month initially. The remaining term for each of the notes varies, but it appears that the remaining terms range from 126 months to not more than 240 months.

## III.  DISCUSSION

As a general rule, student loans fall within the category of nondischargeable debt and pass through the bankruptcy process unaffected. Ekenasi v. The Educ. Res. Inst. (In re Ekenasi),

---

[5]  The parties did not present evidence that would permit the Court to determine the required monthly payment for each separate note held by the USDE. Instead, the evidence consisted only of the aggregate payment due to the USDE each month on account of all its notes, which were executed on two different dates (June 23, 2006 and October 6, 2008). Accordingly, the Court does not have a record on which it can differentiate the amount owed monthly on each of the USDE's loans, which consist of both the Debtor's earliest and latest student loan debt, with the ACS, NHHELCO, and Navient loans having been executed in between. See Grigas v. Sallie Mae Servicing Corp. (In re Grigas), 252 B.R. 866 (Bankr. D.N.H. 2000) (holding that 11 U.S.C. § 523(a)(8) does not allow individual loans to be partially discharged, but does allow dischargeability to be determined on a loan-by-loan basis).

[6]  Prior to trial, Navient offered to restructure the Debtor's loan by reducing the principal balance to $27,500.00, reducing and fixing the rate of interest at 3%, and extending the loan repayment term to twenty-five years, resulting in monthly payments of $130.40. The Debtor never responded to Navient's offer.

8

325 F.3d 541, 545 (4th Cir. 2003). The Bankruptcy Code, however, permits the discharge of a specified class of student loan debt[7] if the continued payment of that debt "would impose an undue hardship on the debtor and the debtor's dependents." 11 U.S.C. § 523(a)(8); see also Nash v. Connecticut Student Loan Found. (In re Nash), 446 F.3d 188, 190 n.1 (1st Cir. 2006). Under § 523(a)(8),

> [t]he creditor bears the initial burden of proving the existence of the debt and that the debt is of the type excepted from discharge under § 523(a)(8). Once the creditor satisfies that burden, the burden shifts to the debtor to prove undue hardship by a preponderance of the evidence. After the debtor makes a showing that would support an undue hardship determination, the burden of production—the duty of going forward with evidence—shifts to the creditor to present some evidence to rebut the debtor's prima facie case.

Blanchard v. New Hampshire Higher Educ. Assistance Found. (In re Blanchard), 2014 BNH 008, 15-16 (citations omitted).

The Debtor does not dispute the existence of the Defendants' loans, or that the loans are of the type described in § 523(a)(8). Accordingly, the Debtor has the burden of proving undue hardship by a preponderance of the evidence. See Grogan v. Garner, 498 U.S. 279, 287 (1991).

> In attempting to prove undue hardship under § 523(a)(8), a debtor: . . . has a formidable task, for Congress has made the judgment that the general purpose of the Bankruptcy Code to give honest debtors a fresh start does not automatically apply to student loan debtors. Rather, the interest in ensuring the continued viability of the student loan program takes precedence.

Bronsdon v. Educ. Credit Mgmt. Corp. (In re Bronsdon), 435 B.R. 791, 797 n.7 (B.A.P. 1st Cir. 2010) (quoting Nash, 446 F.3d at 191); see also Educ. Credit Mgmt. Corp. v. Kelly (In re Kelly), 312 B.R. 200, 205 (B.A.P. 1st Cir. 2004) ("Congress elected to exclude certain obligations from the general policy of discharge based upon the public policy conclusion that the availability and

---

[7] Section 523(a)(8) applies to "an educational benefit overpayment or loan made, insured or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental unit or nonprofit institution; or an obligation to repay funds received as an educational benefit, scholarship or stipend; or any other education loan that is a qualified education loan, as defined in section 221(d)(1) of the Internal Revenue Code of 1986, incurred by a debtor who is an individual." 11 U.S.C. § 523(a)(8)(A)(i), (A)(ii), and (B).

9

solvency of educational loan programs outweighs a debtor's need for a fresh start.") (citing Report of the Comm'n on the Bankruptcy Laws of the United States, H.R. Doc. No. 137, 93d Cong., 1st Sess. (1973)).  As explained by the First Circuit Court of Appeals, the "history [of the statute] reflects a congressional intent to minimize the opportunities to use bankruptcy as a way of avoiding repayment of student loan debts."  T I Fed. Credit Union v. DelBonis, 72 F.3d 921, 936 (1st Cir. 1995).

> From its inception, it has operated as a limit on code sections such as Chapter 7, primarily on the theory that there are some instances in which a creditor's interest in recovering full payment outweighs the debtor's interest in a complete fresh start. . . . Section 523(a)(8) sends the clear message that the interest in ensuring the continued existence and operation [of] the educational loan programs of government units and non-profit organizations supersedes the interest in minimizing the financial difficulties of individual debtors.

DelBonis, 72 F.3d at 937.  "Thus, Congress enacted 11 U.S.C. § 523(a)(8) in an effort to prevent abuses in and protect the solvency of educational loan programs."  Kelly, 312 B.R. at 205 (citations and quotations omitted).

In this district, to prove undue hardship, a debtor must satisfy a "totality of the circumstances" test.  Blanchard, 2014 BNH 008, 15.  As explained by the Bankruptcy Appellate Panel for the First Circuit in 2010:

> The totality of the circumstances analysis requires a debtor to prove by a preponderance of evidence that (1) his past, present, and reasonably reliable future financial resources; (2) his and his dependents' reasonably necessary living expenses; and (3) other relevant facts or circumstances unique to the case, prevent him from paying the student loans in question while still maintaining a minimal standard of living, even when aided by a discharge of other prepetition debts.  Courts should consider all relevant evidence—the debtor's income and expenses, the debtor's health, age, education, number of dependents and other personal or family circumstances, the amount of the monthly payment required, the impact of the general discharge under chapter 7 and the debtor's ability to find a higher-paying job, move or cut living expenses.
> . . .
> The totality test looks to past, present, and future financial resources and necessary living expenses and whether, taken together with other factors, the debtor has the ability to repay while maintaining a minimal standard of living.

10

Bronsdon, 435 B.R. at 798 (citations and quotations omitted) (quoted in Blanchard, 2014 BNH 008, 14).  "[D]istilled to its essence, the finding of undue hardship under § 523(a)(8) following the totality of the circumstances test rests on one basic question:  'Can the debtor now, and in the foreseeable near future, maintain a reasonable, minimal standard of living for the debtor and the debtor's dependents and still afford to make payments on the debtor's student loans?'"  Bronsdon, 435 B.R. at 800 (quoting Hicks v. Educ. Credit Mgmt. Corp. (In re Hicks), 331 B.R. 18, 31 (Bankr. D. Mass. 2005)).  Whether a debtor has made a good faith effort to repay his or her student loans is also "a relevant factor in a totality of the circumstances inquiry."  Blanchard, 2014 BNH 008, 15.  While courts measure undue hardship "as of the trial date," it is "a forward-looking concept."  Bronsdon, 435 B.R. at 800 (citing Kelly, 312 B.R. at 204; Kopf v. United States Dep't of Educ. (In re Kopf), 245 B.R. 731, 744 (Bankr. D. Me. 2000)).

### A.  Past, Present, and Reasonably Reliable Future Resources

The Debtor has been employed in her field of study since 2011.  Her income has increased over the last three years by 41%, 28%, and 21%, respectively.  The Debtor's current net earnings are $2,312.87 per month.  She also receives an income tax refund that has averaged $76.83 on a monthly basis over the past four years, resulting in average net income of $2,389.70.  The Debtor testified that she may be eligible for bonuses at her new job.  As the record establishes, the Debtor's income has risen steadily since her college graduation, and "her prospects for a steady increase in income over time are promising."  Savage v. Educ. Credit Mgmt. Corp. (In re Savage), 311 B.R. 835, 840 (B.A.P. 1st Cir. 2004).  Nothing in the record indicates that this trend will not continue.  The Debtor herself testified that she anticipates continuing to work in the legal/criminal defense field and is actively looking for better, higher

paying positions.  She admitted that her current salary is on the low end of the scale for legal assistants and that (with greater experience) they can earn as much as $70,000.00 per year.

The record does not establish that the Debtor's future income will be insufficient to pay her student loans and provide a minimal standard of living.  See Nash, 446 F.3d at 192 ("Under any test assessing eligibility for discharge of student loan debt, [the plaintiff] must show that her current inability to maintain a minimal standard of living if forced to repay the debt will continue into the future."); Savage, 311 B.R. at 839-40 ("The debtor must show not only that her current income is insufficient to pay her student loans, but also that her prospects for increasing her income in the future are too limited to afford her sufficient resources to repay the student loans and provide herself and her dependents with a minimal (but fair) standard of living").

Further, during the roughly three-and-a-half years prior to filing for bankruptcy, when the Debtor was paying her student loans as she was able, the Debtor paid an average of $4,628.00 per year.  At that time she was making between $15,922.00 and $28,853.00 per year.  The Debtor has more than doubled her salary since 2011 to $34,840.00, thus making it reasonable to assume that she could, at a minimum, double her average annual payments and pay at least $9,256.00 per year.

The Debtor also has accumulated $4,000.00 in savings since graduation.  The Debtor could easily apply some of those funds to her student loan debt.

**B.  Reasonable Necessary Living Expenses**

Under the totality of the circumstances test, "a debtor must show that her necessary and reasonable expenses leave her with too little to afford repayment."  Savage, 311 B.R. at 840. Necessary living expenses are those that a debtor "could not cut from the budget and still maintain a minimal standard of living."  Id. at 841.  The Debtor's actual living expenses at the

time of trial (which consist solely of food, clothing, medical expenses, cell phone, car-related expenses, and storage unit rent) totaled $1,108.42.  The Debtor testified that she has no entertainment or recreation expenses (her boyfriend pays for those); she only dines out "occasionally," often grabbing lunch at a fast food restaurant; she visits the hairdresser once every three months or so; her vacations mostly consist of visiting friends locally on the weekends; and she contributes nothing towards her retirement.  With the exception of the storage unit expense, which the Debtor admits is not necessary or reasonable, the Court finds that the Debtor is frugal, and that her monthly expenses ($985.92 without the storage unit expense) are modest.

Contrary to what the Debtor's budget at Schedule J reflects, the Debtor does not have any current housing expenses in the form of rent or utilities.  The Debtor contends, however, that she should be permitted to claim housing expenses of $925.00 per month ($800.00 for rent for a one-bedroom apartment in Nashua and $125.00 for utilities) because she may need to pay these housing expenses in the future.  The Debtor testified that her relationship with her boyfriend is "day-to-day" and her current living arrangement may not continue in the future.  If the Debtor were allowed $925.00 toward her non-existent housing expenses, her monthly expenses would increase to $1,910.92 per month.

Including the housing expenses in the Debtor's budget results in disposable income of $478.78 per month, which she could use to pay her student loans.  Excluding the housing expenses in the Debtor's budget results in disposable income of $1,403.78 per month, which she could use to pay her student loans.  Under either scenario the Debtor has surplus funds each month that she can use to pay her student loan debt.  During the trial, the Debtor acknowledged that she has a surplus each month but believes she has the ability to pay only $212.87 per month

13

toward her student loans, which amount she is willing to pay for a period of more than twenty years or until she is forty-nine years old.

As other bankruptcy courts in the First Circuit have held, a debtor cannot establish undue hardship while carrying a monthly surplus or otherwise retaining funds that could be used to pay her student loan debt.  See, e.g., Paul v. Suffolk Univ. (In re Paul), 337 B.R. 730, 737 (Bankr. D. Mass. 2006) (holding that the debtor could not establish undue hardship where she held a certificate of deposit for $25,000.00, which she did not plan on using to pay her student loan debt); Brunell v. Citibank (South Dakota) N.A. (In re Brunell), 356 B.R. 567, 580 (Bankr. D. Mass. 2006) (refusing to find undue hardship where the debtor had a monthly surplus from which she could pay her student loans); Dolan v. Am. Student Assistance (In re Dolan), 256 B.R. 230, 239-40 (Bankr. D. Mass. 2000) (finding the debtor's student loan debt nondischargeable where the debtor had a monthly surplus of almost $600.00 and still enjoyed things that one could consider amenities).  Here, the Debtor's surplus currently totals $1,403.78 per month, while payments on her student loans total only $988.65 per month.  Thus, the Debtor is able to maintain her current, minimal standard of living (which does not include any actual housing expenses) and pay her student loans.  If the Debtor were to pursue the various options available to her to reduce her monthly student loan expense, her payments might decrease to as little as $726.33 per month, which would give her some money to pay rent and utilities in the future, without any further increase in her income.

### C.  Other Unique Facts or Circumstances

The third factor under the totality of the circumstances test is whether there are other relevant facts or circumstances "unique to the case" that would prevent a debtor from maintaining a minimal standard of living.  The Debtor has not presented any other facts or

circumstances to show that paying her student loans would impose an undue hardship.  She did testify at trial that she would like to have a family and children some day and save money towards her retirement, but she did not attempt to quantify how having a family or contributing towards her retirement might impact her ability to maintain a minimal standard of living if required to make payments on her student loans.

In the Court's view, there are relevant facts and circumstances demonstrating that paying the Debtor's student loans would not impose an undue hardship.  The Court notes preliminarily that a significant period of time has not elapsed since the time the Debtor's repayment obligations began and when she filed for bankruptcy in order to seek the discharge of her student loans.  And, during that three-and-a-half year period, the Debtor was able to make significant payments on her student loan obligations.  Thus, as the Defendants argue, the Debtor's request to discharge her student loans could be considered premature.

Additionally, the Debtor's health has not changed since she borrowed money to fund her college education.  The Debtor is a young, healthy person with no dependents.  She has been gainfully employed since graduation, and is presently employed in her field of study, with many more working years ahead of her.  If her income continues on its recent trajectory, which—given her obvious intelligence, work ethic, and marketable skills—seems likely, she will have an increasingly better ability to repay her student loans in the future.  Depending on her job status, she may begin to receive annual bonuses.  Because the Debtor is young and has no dependents, she also has the ability to take on a second job, which would alleviate some of the financial strain she may feel.  For example, working just twenty hours a month at $12.50 per hour would increase the Debtor's monthly gross income by $250.00.

The Court notes further that since filing bankruptcy, the Debtor has been able to purchase a new car.  Unlike some debtors who may be saddled with a home mortgage or other long-term debt, the Debtor is not burdened with any other significant debt other than her car loan, which requires only a modest payment each month.  Rather, the Debtor's student loan debt consists of the majority of her obligations and clearly is the reason she filed for bankruptcy.

Considering the record as a whole, the Debtor has failed to demonstrate any "truly exceptional circumstances" that would warrant the discharge of her student loans.  Bronsdon, 435 B.R. at 797 n.7 ("Proof of undue hardship is generally found only in 'truly exceptional circumstances, such as illness or the existence of an unusually large number of dependents.'") (quoting DelBonis, 72 F.3d at 927).  Accordingly, the Court concludes that the Debtor has not met her burden of proof.  Although the Debtor's lifestyle is modest, the Debtor's actual budget shows a surplus each month from which payments can be made to the Defendants.  See Kopf, 245 B.R. at 747 (holding that the debtor failed to demonstrate that she would face undue hardship if her student loans survived her chapter 7 discharge).  Thus, based on the evidence presented, the Court finds that the Debtor has, and will increasingly have in the future, the ability to repay her student loan obligations while maintaining a minimal standard of living.  See Savage, 311 B.R. at 843 (concluding that a forty-one year old debtor with a stable job would have an increasing ability to pay her student loan debt).

## IV.  CONCLUSION

For the reasons set forth above, the Debtor has not satisfied her burden of establishing that paying her student loans would constitute an undue hardship within the meaning of § 523(a)(8).  Accordingly, the Court finds that the Debtor's student loan debt should not be

excepted from discharge.  This opinion constitutes the Court's findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052.  The Court will issue a separate judgment in the Defendants' favor.

    ENTERED at Manchester, New Hampshire.


Date:   September 3, 2015　　　　　　　　/s/ Bruce A. Harwood
　　　　　　　　　　　　　　　　　　　　Bruce A. Harwood
　　　　　　　　　　　　　　　　　　　　Chief Bankruptcy Judge